Good morning. Good morning, Your Honors. Counsel, may it please the Court, Seth Floyd, on behalf of the appellants, the trustees of the Pacific Coast Plan in this matter. This time, Your Honors, I'd like to reserve four minutes of my time for rebuttal. Thank you, Your Honors. Your Honors, as this case was pleaded, litigated, and decided, it was about a single issue. And the single issue was whether, under Amendment 14 of the Pacific Coast Plan document, the trustees were permitted to enact a $1.00 withholding on amounts that would otherwise have been remitted under the reciprocity agreement from Mr. Lehman's traveling fund, the Pacific Coast Plan, to his home fund, the Puget Sound Plan. Let me ask you this, Counsel, before you get too far. It seems to me that the gravamen of the complaint and the underlying hearings, at least till the point of the motion to enforce or clarify, simply didn't deal with Amendment 24. It dealt exclusively with Amendment 14. What are we to make of that? The final order seems to tie in to Amendment 24, and yet there was, by my lights, very little, if any, discussion of it. Your Honor, I agree with that characterization. I think you'll find the answer to that question in one page of the District Court's analysis. I believe it's at the record on, I think it's 39 or 40. The Court seemed to confuse or conflate Amendment 14 with Amendment 24. In that section, he claims that, or states, holds that Amendment 14 is a default schedule under Amendment 24. Well, factually, that just could not be the case. And legally it could not be the case. Amendment 14 was adopted prior to the really critical stage declaration, right? That's correct. So it wasn't part of the rehabilitation plan. So that's an error, I think. But why does that? I mean, I understand that your team likes that. That wasn't a trick question. But what strikes me as missing here, because there does seem to be a pattern where they're just conflated or treated as the same. Correct. But I don't read anywhere in your briefing where the trustees explain what different argument they would have made as to Amendment 24. Well, the different argument that would have been made is several-fold. First, what would have had to be argued in the District Court to get to an order that you could then apply, and plaintiff's argument, by the way, is that it doesn't matter that we didn't get to Amendment 24 because the legal analysis would be the same. In other words, our theory of the case is identical. So I'm asking you why it does matter. It does matter because they aren't the same. Right. Amendment 24 has an overlay of the Pension Protection Act. The Pension Protection Act requires plans that are in critical status to do certain things. And the easiest way, because I'm not a numbers guy, the easiest way for me to think about it is when a plan goes into critical status, a balance is off. There's too much going out and not enough coming in. And there are only a limited number of ways to fix that problem. Can I ask you my question? Because I don't want to take up a whole lot of your time. Because I have timelines and graphs and charts and numbers on this case. But as of the day that Amendment 24 did come into effect, my understanding is what would have happened then is there's a couple of alternative schedules and there's a default schedule, and that as the collective bargaining agreements had expired, then at different dates, right, that there would have been one of those schedules, which would have provided for different formulas, would have taken or been imposed by default upon the various collective bargaining agreements. Is that right? Yes. But they wouldn't have been treated the same, necessarily. That's correct. It depends on which schedule was adopted. Right. So even if none of the unions bargained otherwise and they all received the default schedule, they at least would have taken those default schedules would have at least kicked in as of different dates. Is that right? That's correct. It's tied to the expiration date of the collective bargaining agreement. Right. So here's my problem. Under the Pension Protection Act of 2006, what I can't understand is I fully appreciate where you're getting to, which is if the plan is in critical status, we've got to increase employer contributions and maybe decrease an individual's accrual rate to shore up the plan. Correct. But for this class, it seems to me very problematic. And I'm going to, of course, want opposing counsel to address this, too, if you would. It seems very problematic that under 24, when we really do get to 24, and we're talking about travelers, where those are pass-through payments. Why would the employer contribution increase if that money is not going to shore up the Pacific Coast fund at all but is going to wind up shooting out the door to the home funds? What am I missing? Well, that's exactly why they're not entitled to those funds. And there's nothing missing from your analysis except that. They're not entitled to what funds? The additional PPA contributions. Under Amendment 24. Under Amendment 24, correct. And there's another thing that happens when the plan goes in, when Amendment 24, in fact, let me back up to give a little more context than that. When a plan goes into critical status, the plan is required to adopt a rehab plan. The rehab plan in this case is Amendment 24. Well, a few things happen at that point. The contributions that are being made, and for Mr. Layman in particular, is $4.62. It's frozen. What then happens, and if you look at Section 305E of ERISA, it's the last paragraph, what happens then is the accrual floor, and plaintiffs and the district court make a lot of hay about the accrual rate. Well, there's something important to know about the accrual rate. The accrual rate happens in the home fund. So on the two sides of the equation I was describing before, the incoming amount, the contribution amount, is set by the participating fund, the traveling fund. The accrual rate is set by the home fund. So when Mr. Layman's contribution amount is frozen when Amendment 24 goes into effect, whatever the accrual rate is, it's kind of a red herring, actually, because that only affects the people who are in the participating plan. The amounts going out, the accrual rate is whatever it is in the home fund, and the Pacific Coast plan, for example, can't affect those amounts. I've taken you far afield from Judge Smith's question, but I really appreciate your patience, because I read it the same way, and of course opposing counsel have a chance to respond, but this gets back to, in fairness to the district court, it seems to me none of this was teed up, and the district court thought, and it really does read to me like the litigation was about Amendment 14, right? But then we have a motion, or an order on clarification that says otherwise. Well, yes, and I think we've already gone over one of the reasons I think that was is because he conflated the default schedule with Amendment 14, but another reason may be a terminology one, and if you read, and there's no case that governs this one, we're kind of beyond where the case law gets you on this issue of additional PPA contributions that are made pursuant to a rehab plan, but one problem with the district court is calling it withholdings. Amendment 14 certainly wasn't withholding. It was a dollar that was taken off the top for everyone, not just travelers. It didn't treat classes of folks differently. It treated travelers and folks who were in the Pacific Coast plan exactly the same. But then, and I agree with your characterization, when you get to the clarifying orders, the But, Andrew, I have a lot of sympathy for the district judge's ruling as to Amendment 14. I don't see any justification. It seems to me to be absolute error that the trustees authorized that. Yeah, well, the trustees certainly did authorize it, but I would respectfully disagree with the district court's conclusion on that. So focusing on Amendment 14. Okay, what's your best shot on Amendment 14? My best shot on Amendment 14 is that what determines whether what's going to be remitted to a traveler is the reciprocity agreement. So set aside Amendment 24. Well, okay, so if you look at the reciprocity agreement contribution, and this is in the record. Are we going to talk about the definition of reciprocity? No. Of contribution? Of contribution, correct. Okay. Well, I think it's important. You know, I understand. All through that part of the briefing, I didn't find it persuasive. It's your time, but. Well, but I want to address your question. Okay. But if you're telling me, I'm not going to persuade you. Perhaps I won't, but. It's a tough sell, but if you want to take your best shot, I will listen, of course. So, well, let's start with the plan document. The plan document defines contributions very broadly, right? It's any amount that's required to be paid under a CBA by a participating, by the employer in the participating plan. But it's very broad. That was before the reciprocity agreement went into effect. So that's contribution at its most broad. And by the way, contribution isn't defined in ERISA, so we can't look to ERISA to decide what that is. Well, then, when the participating plans adopt the reciprocity agreement, they have virtually the same definition, except they add this, and this is at the record on 76. It's the amount the employer is required to make by the terms of a collective bargaining agreement for the purpose of providing a plan of benefits. Well, that must mean that there are amounts that can be paid that don't go to provide a plan of benefits. That doesn't say what those are, and they probably weren't contemplating the Pension Protection Act at this time, because I don't know if this is in the record, but I believe this document was adopted before the Pension Protection Act came into effect in 2006. Does that matter? Well, it does matter, because if we're looking at Amendment 14, and if you look at that particular section of the record, the language of Amendment 14, what the trustees did is they said, we're going to take this dollar off for funding improvement. The plan's not in critical status yet, but we're going to take this dollar off for funding not go to fund a plan of benefits. So the question is whether the trustees are allowed to do that, and I don't think there's anything in ERISA that would prevent them from doing that. The district court said they can't do it because it reduces the accrual rate. The district court said it was an abuse of discretion to... To interpret the reciprocity agreement that way, correct, and then the district court goes on to say, and that also violates ERISA because you've reduced the accrual rate, and I think that's an error. Yes, I agree with that. Could I ask you then, getting back to Judge Smith's point on this, that the litigation really seemed to be teed up to be about Amendment 14, and certainly the plaintiff was, I think, didn't work under Amendment 24, just chronologically wasn't there during that period of time, but then the trustees stipulated, I think, to the class and to that individual serving as class representative. Yeah, that's correct, and I don't think that stipulation is inconsistent with the fact that the case was only about Amendment 14, and here's why. This is a factual point that I think was misconstrued both by the district court and has been... That's carried over into the plaintiff's briefing. When Amendment 24 came into effect under the rehab plan in July of 2009, the effect of that was not that Amendment 14 went away. In fact, Your Honor, you just described a minute ago about how there's a staggered timeline for when the provisions of Amendment 24 get enacted by the plans or by operation of law, they get imposed the default schedule. Well, during that interim, two things happen. One, there's an employer surcharge of 5% that gets tacked onto the employers. There is case law out of the Third Circuit that addresses that. The other thing that happens is Amendment 14 stays in effect. If you look at the limited discovery that was provided by the trustees as required by the district court, it's a chart. I think it's on the record at 220. You'll see that if you go individual by individual, that dollar under 14 is coming out for a while. It varies by individual. And there's no discovery in the record about when that staggered period happens. No CBAs are in the record. No record of when the default schedule is. I suppose you might be able to extrapolate that. But to answer your question, Amendment 14 continued. So the class definition states that it's everyone situated similarly to Layman under Amendment 14. That continues from July 1, 2008. That's when Mr. Layman started working in the plan, the jurisdiction of the plan, through the present, which I think at that time was 2013 or 14. Well, if you look at those charts, some of the guys, those CBAs hadn't expired. So the dollar was still coming out under Amendment 14. So it's not inconsistent that you're only looking at Amendment 14, but you're including guys after Mr. Layman stopped working in the plan. It's something else that could have caused the district court to misunderstand the point you're making now about Amendment 24 and misperceive the scope of the litigation. It certainly could have. And that's a fact. You know, there's a case, I think it's out of a district in New York, that talks about how complicated ERISA is. It's not necessarily surprising that he was conflating those concepts. And here's another reason why he might have conflated it. There was a reciprocity administrator opinion that was written before the plan was in critical status talking about transfers. And so in the court, I'm not going to say that he relied on it, but he referenced it. And that may have confused the issues as well because the timeline didn't match up and he wasn't thinking about the dates. Counsel, I appreciate the sophistication of your argument, but I still get back to the basic point. There's nothing in the record that I see that suggests that the district court really wrestled with the effect of Amendment 24. And my question to you is, how can it stand in that way? Don't we have to send it back to the district court to at the very least say, you know, this is what I meant. I was aware of 24 and this is the way it works. Yes, certainly if the court's position is that you had Amendment 24 before you, and I think as your honor was alluding, we think your argument is weaker on that point, but you never got to 24. Yes, certainly that would be the relief is to send it back, which I think basically moots all of the other arguments that were raised in the cross appeal and in the second appeal because we're going to have to go back and figure that out. Although I will say I'm not I'm not sure that Mr. Layman can represent a class of folks who fall under Amendment 24 because his facts wouldn't get you there. But yes, I do believe the appropriate remedy. I have a problem. Mr. Layman was never subjected to any withholding under Amendment 24. How could withholding under that amendment have been before the district court when it ruled on the motion for summary judgment? It wasn't your honor. And I completely agree with that. All right. Well, then why shouldn't we send this back for the district court judge to analyze withholding under Amendment 24? Well, I think you could send it back. I think the issue is going to be layman is not the right class member to get you to Amendment 24. I mean, I guess hypothetically, the district court could say, nope, I think the analysis is identical and therefore I get to it. And I'll amend my my order. I could also say you stipulated to it. He could also say we stipulated. But I think that's misconstruing the class certification. And I was not something we would reach here. Now, that's not what you're suggesting. But I'm sure opposing counsel is going to he's getting ready to jump up right behind you there on that point. But we don't have that really. Right. Correct. And I'm on remand. I think we would we would address all of all of those issues. But just chronologically, getting to Judge Nelson's question, as of the time the district court ruled at summary judgment, the class had there was no class yet. Right. OK, that's correct. Yeah, that happened between. I think it was after the first order on clarification, but before the penultimate one after that. Right. And at the first order and clarification went to earnings, I think. That's correct. And that was not opposed. That's correct. OK. Yeah. And I think I would concede here that if they were entitled to the dollar, they would be entitled to the earnings there on. Right. OK. And I'll see the rest of my time for. OK. Thank you. Very good. Good morning, counsel. Good morning, Your Honors. I please, of course, my name is Rich Birmingham. I'm an attorney with Davis Right Terrain. I represent Richard Lehman and the class of travelers. I just want to start with one factual issue of how reciprocity works. I think we'll make this clearer. So the way reciprocity works for these travelers is that when Mr. made on his behalf to that fund, but the employers are deemed to to be making that contribution to his home fund for his behalf. And those assets are supposed to be transferred without reduction, without any withholding. So they never become assets of the California plan. So it's right to think of them as pass through. Yes, straight through. Right. Exactly. And they don't pay PG PGC premiums on those contributions because they say they're never they're never participants in that fund. So the argument before the district court was and the argument they decided was that any withholding of those amounts for any reason, it doesn't matter why. It doesn't matter whether it was Amendment 14. It doesn't matter whether it was Amendment 24. Any withholding is violates the plan document reciprocity. And that's the holding that we're asking you to affirm. Is that what you believe that the document itself says that in so many words just says you can't take anything out of this. It's just a pass through and you've got to send it back to the home fund. Yes, Your Honor, because. Or would you cite in the record for that? The the plan itself says that Section 504 says that all transfers have to be done. And the reciprocity agreement transfers have to be done. Well, all transfers, all contributions made on their behalf have to be transferred. And the reciprocity agreement says that they have to be transferred without administrative fees or any other fees for any reason whatsoever. But once once it was we moved into to Amendment 24 rather than 14. My understanding is that as those CBAs expired and and the other schedules kicked in, the employer contribution would have kicked in increased. And and yet that the purpose of the Pension Protection Act of 2006, as I understand it, is to shore up a plan that's in trouble. And the password would not accomplish that at all. So and and and to make things a little more complicated. That issue wasn't teed up to the district court at all. Well, you just didn't get that far. I don't think so. No, Your Honor, it was teed up because basically we were arguing and with the court. So first argument, big picture is you can't withhold for any reason whatsoever. It doesn't matter whether they're PPA. It doesn't matter whether it's 24. It doesn't matter whether it's Amendment 14. It doesn't. You have no right to withhold. They're not your assets. You already won that point with me. OK. OK. So then our alternative argument was if you're required to withhold some of those assets, OK, then those assets are subject. Now you've made the participant a participant in the California fund because you kept assets that were contributed on his behalf. So now those assets are subject to 305 or 204 of the code. And the court talks about that, but it's all dicta because it doesn't matter. Well, it seems to me this case matters a lot, and not only for the participants here, and I don't mean to make light of that, but this isn't the only plan in trouble in the Ninth Circuit. There are other issues, other cases bubbling up. And so I'm very concerned about how this case is treated and that we not paper over this distinction between Amendment 14 and Amendment 24. I just want to give you an opportunity to respond. Well, on both of those amendments, Your Honor, the issue is are they employer contributions subject to the collective bargaining agreement and the reciprocity agreement? So on our analysis, and I believe you agree that they were employer contributions subject to the reciprocity agreement, which says they all have to be, you know, withheld or transferred. The pass-through. Yeah. That's the part that I'm certainly leaning heavily. I think that you've made a very persuasive argument. What I don't understand is when you get into critical status under Amendment 24, why the employer contribution should increase and have that shoot back to the home fund. I don't understand how that serves the purpose of the Pension Protection Act of 2006. Well, Your Honor, it serves a purpose in this way. They are employer contributions, so they're subject to the reciprocity agreement. Okay. What the court in the reciprocity agreement has to be uniform. Everybody has to treat it the same way. So with respect to Mr. Lehman, if that contribution is a portion is being withheld by the California fund saying we need it to fund the benefits, and then the other portion is transferred to his home fund, and they're taking $4. Let's say they take $4 out of what's remaining. You know, Mr. Lehman is paying for two plans that are in financial trouble, one of which he's never getting a benefit from. All the cases have held that employer contributions are, the PPA contributions are employer contributions with one exception, and that's the surcharge. And our damages, Your Honor, that have been stipulated to by the other side, and they provided them, all those damages are amounts under the schedules that have been adopted or Amendment 14. None of them are surcharge. So surcharges aren't in this case at all. And you might say, well, is it unfair? I mean, shouldn't these contributions go to this fund for PPA? And the answer to that, Your Honor, is that if they wanted these funds to be used for the PPA, the simple thing they could have done was revoke the reciprocity agreement. My question wasn't about whether it was unfair for these funds to not go to the PPA. You've convinced me, I think, that you certainly have a very strong argument that there's this pass-through. What I don't understand is why the employer contribution should have increased for this class, because they're just pass-throughs, and that increase, the purpose of the increase, as I understand it, is to shore up the fund that's in trouble. The Pacific Coast Fund. Well, the increase, Your Honor, is dictated by the collective bargaining agreement. And the increase says that all workers have to get this contribution for all hours that they perform within this jurisdiction. So when Mr. Lehman is working under that collective bargaining agreement, and it's a $10 contribution plus the $5 PPA, it is going into his account as an employer contribution. And then the reciprocity agreement says that all employer contributions. I appreciate that. But that's, I think, just telling me the mechanics of what I know, or at least I think I figured out. And your confirmation is appreciated. But is there a legal authority? Does anybody rule on this? Or is there a statute or a reg that I'm supposed to look at that talks about this specific circumstance for travelers? Well, the case law says that all the contributions are made pursuant to a collective bargaining agreement. The only exception is the C&C wholesale case that says surcharges are not. So an argument could be made that the surcharges that were made were not to be sent back because they weren't employer contributions. But if it was an employer contribution that went in, the analysis is it's an employer contribution under the CBA. And if they wanted to do something else with it, if they wanted to treat it in their part. Forgive me for interrupting. But right to that point, you said the analysis is. Is there authority for this? Or are you just telling me that I should rely upon, you know, your argument relies upon the reciprocity agreement and the CBA and the authority that I should look to? Excuse me. I didn't mean to interrupt you. Not at all. The authority, Your Honor, would be the C&C wholesale case, which basically examined this issue. And the issue was whether these contributions were employer contributions or not. And the court held that they are employer contributions under CBA. And so once you reach that analysis, then you just flow it through by what the various provisions of the plan hold. Thank you. Can I refocus a couple of things here? Sure. I ask opposing counsel whether this, because the district court didn't focus on Amendment 24, does this case need to go back to the district court to have the court at the very least discuss Amendment 24 and, if it's the same analysis, perform the same analysis? What do we do with that? Absolutely not. It does not have to go back because this argument was raised, for one. And, you know, the argument was raised in a motion to clarify whether the court considered Amendment 24 in its deliberations. And the court basically said, look, my opinion is that all contributions have to be transferred without reduction for any reason. I looked at Amendment 14. I looked at Amendment 24. It doesn't change my analysis. It was argued by the other side. You know, our arguments on 305 and 204, you know, our 305 is a PPA provision. You know, so to say that nobody thought that we were talking about PPA this whole time, that we were only talking about contributions from 2008 to 2009, is ridiculous. This was a class action that was certified and stipulated to all contributions. But it wasn't a class action yet. At the time of the summary judgment ruling, it wasn't a class action yet. It was filed as a class action, Your Honor. Well, the class hadn't been certified, and the proposed class representative didn't work under — you know what I'm talking about. Right. He didn't work under Amendment 24, so that's not quite fair, is it? Well, the class hadn't been certified. It was filed as a class action. We were raising principles that were going to apply equally to every member of the class. They stipulated that every member of the class was in a similar position to Mr. Lehman, and the class was certified at that basis. If they had a different argument of why they were — you know, some argument was different, they should have raised it at that time. They didn't. They stipulated it to — it went forward. They said, oh, we thought — there's nothing in the stipulation that talks about — Would you clarify for me, then, what arguments would you make with respect to Amendment 24 that differ from those you have made with respect to Amendment 14? There weren't any different arguments. They're identical. They're identical, Your Honor. I just wanted to clarify that. You know — And given that fact, then, I gather your position is it doesn't matter whether the district court alighted Amendment 14 and Amendment 24. When you had the later motion, the district court acknowledged that he was aware of it, and that's all we need. That's all you needed. What about the fact that the district court said in his original summary judgment motion that the reason that the trustees abused their discretion is that he looked to the ambiguity, the ambiguity in the plan — forgive me, in the amendment, without specifying which amendment. But I think if you look at the amendments, he really had to be referring only to Amendment 14. Well, Your Honor, I think when the — I mean, in other words, I think that's the only place the ambiguity exists. No. I think what the — if you go back to what the district court's original holding was, the district court looked at Section 504 of the plan and looked at the reciprocity agreement, and on those provisions argued that it was unambiguous that everything had to be transferred and that no withholding could be made for any reason. What the — He found an ambiguity. He said there was an ambiguity, and it was an abuse of discretion for the trustees to interpret the ambiguity the way they did, meaning to apply it to the travelers. Well, the ambiguity he was talking about at that point, Your Honor, was — well, he said in the 504 ruling, basically, the trust was arguing that the — that they had the power to amend that provision, and the district court held on that point that they didn't have the power to amend the provision and that even under a differential standard of review, their analysis failed. So that was his holding on 504. What he said with respect to the amendments in 305 and 204 is all dictative. He didn't rule on that basis. He didn't even — Are you talking about his alternative ruling? He said in the alternative, and then he went — is that what you're referring to? Right, right, Your Honor. I mean, all that was related to the arguments of 305 and 204, and we're not arguing that. That evidence is another — that's another reason for concern because he talked about the applicability of 305 to Amendment 14, and that's a non sequitur. It doesn't matter, Your Honor, because 305 and 204 are irrelevant under his rulings. It doesn't make — matter if he made a mistake on his characterization of 305 and 204 because his holding is they didn't have the power to withhold any contributions for any reason whatsoever, and until — he even says until that reciprocity agreement is terminated, you have to transfer every dollar that you receive under the collective bargaining agreement. Is there any place in any part of the record where the district court acknowledged an awareness that under the default schedules, once the plan went into critical status, that the employer contributions would increase? Well, I think they knew — he knew they were increasing because we argued, you know, in our motion to clarify, Your Honor, that, you know, this started out as a dollar an hour. It went up to $13 an hour. So everybody knew that they were increasing under the rehabilitation plan. And, you know, the trust's argument was that, you know, this case is all about this $1. It never was about the $1. It was about withholding any of the contributions, and the damages were based on that. The motion to clarify, you know, particularly brought that to his attention, that it wasn't a dollar contribution. It was the increasing contributions under the PPA. So is there any place in the record where I can find this discussion anywhere about the increased contribution not winding up with the Pacific Coast plan and that being in conflict or at least certainly in tension with the PPA? Well, Your Honor, they — the only place the PPA was raised was, you know, we raised — said that, you know, surcharges aren't PPA contributions or aren't collectively bargain contributions and everything else is. So that's how it was raised. Okay. Fair enough. Thank you. I have three minutes left, and what I would like to do in that three minutes is just talk about the attorney fee award for a minute because that's also up on appeal. And there our position is simply that when we went to the court for attorney's fees, our argument was that the local rate was really the national rate for Arisa attorneys. And to set forth that rate, we relied on the McGee rate, the McGee case that said it was the national rate, and then we gave a number of national cases on attorney's fees. And that was sufficient to meet our burden of persuasion. The district court — and tellingly enough, the — you know, these were fees that had to be paid by the trust individually, basically, and they didn't challenge our rate at all. So there was nothing on the record. There was no need for us to argue against ourselves and say, no, the rate shouldn't be our national rate. It should be some other rate. Under case law, once we've made our burden of production, then the analysis is that those rates are presumed to be the market rate. And the trust accepted that. They had every — this wasn't a settlement. This wasn't a common fund case. This was a 502G fee-shifting case. And so they accepted those rates. And it was abuse of law and abuse of discretion for the district court, then, on its own, to turn around and put in evidence of an additional rate. So, counsel, to make sure I understand your position, you're saying that if you allege that the rate is X, based on your firm's fees, and the other side does not counter those, that the district court is bound by the rate that you suggest? Is that what you're saying? I'm saying that if we do that and put in case law to support that, which is a two-criteria that, under the Yip case that the Ninth Circuit says, then that is presumptively the rate. And if they don't challenge it, it's — So you're saying if the district court — if the normal practice of the local court is to apply the local rates or some blending of what you suggest and something else, that the district court has no discretion to do that? Is that your — as long as the other side doesn't suggest any contrary rate? Right. They're the ones that are paying the — I understand. I'm just asking for the limits of discretion of the judge. Right. And I think the Gonzales case says that. If it's uncontested, you know, the judge can't do his own research or analysis. The Ingram case says that if it is contested, the judge certainly can do his own analysis. And the other point I would just make — you know, so we're being criticized for not arguing against ourselves. I mean, if he would have said, you know, I want proof of a different rate, a regional rate, we would have put in all the affidavits that — I think we have your point, and we're over time, unfortunately. Okay. Thank you, Your Honors. Thank you. So, Counsel, I think you have a little bit of rebuttal time. Yes. Thank you, Your Honors. And I just want to illustrate a couple of points on rebuttal that you discussed with Counsel. Counsel's argument today is that it doesn't matter why you would retain a payment made by an employer, whether it's under Amendment 14 or Amendment 24. Well, I would disagree with that position because of the Pension Protection Act. And, Your Honor, you hit on a few of the policy reasons why. The Pension Protection Act — well, ERISA at large is designed to protect employee pensions. To that point, Counsel, if we were to send this back, as you would like, what arguments would you make with Amendment 24 and the 4 and also the Pension Protection Act that were not made to the District Court before in the previous hearing? Several, Your Honor. Okay. The first one would be that the Pension Protection Act requires these plans to do certain things, including raising these non-benefit employer contributions that go to fund the solvency of the plan. That issue wasn't raised below because, frankly, the Pension Protection Act wasn't raised and argued below. And just a quick illustration on Mr. Lehman to make that point, the contribution rates, as he indicated, are already up to, I think, $13. It was $4.62 when the plan went into critical status. It's now up to $13, I believe he represented. And if you look at the schedules that went into play, they go up 400, 500. I think one of the schedules was 600%. So we're going to be sending all of that money back to a home fund where Mr. Lehman and others like him are going to be accruing a benefit at that astronomical rate. That's just an absurd result because it's a total windfall to these travelers. Is it possible that some of those schedules decrease the individual members' accrual rates? It would, members who are in the plan. Yes, that's correct. Not travelers. Travelers accrual. Members in the Pacific Coast plan. In the Pacific Coast plan. Correct, Your Honor. So that's argument number one. Argument number two, the Council spent a little bit of time talking about the CNS case out of the Third Circuit. And I just want to give a little context about that case. That was a withdrawal liability case where the court was deciding what is the highest contribution rate for plugging that into the formula for an employer who leaves the plan. And the court held that surcharges and additional PPA contributions like the ones we have here were not in front of the court in that case. But the court held that surcharges, that 5% that gets automatically tacked on when a plan is in critical status, are not subject to that highest contribution rate. But the rationale for that was because they do not go to fund benefits. Well, two things. They're part of a CBA, or excuse me, they're not part of a CBA. They're imposed by statute. And they don't go for benefits. They're simply to fund the improvement of the plan. Well, there's not a whole lot of difference between that and these additional PPA contributions. Technically, they get incorporated into the CBA through one of the schedules. But they're really not bargained by the parties. They're imposed on the parties as a way to solve this solvency problem with the plan. And that's required by the PPA. So, Your Honor, to answer your question, those are all the arguments that I think need to be elucidated before the court if the court is going to decide on those issues. And that simply wasn't before the court in those cases. In other words, the district court simply didn't wrestle with the effect of the PPA and or Amendment 24 together on what it had previously discussed. Your Honor, that's a much more articulate way to say what I just said, yes. That's correct. That wasn't before them. And as you said, he didn't analyze that issue. Thank you very much. Thank you both. Thank you. For the argument. We appreciate it. The case just argued is submitted.
judges: D.W. Nelson, M. Smith, Christen